### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        Plaintiff,

    v.                             Case No. 18-03133-CR-S-BCW

**MARILYN LUANN NOLAN,**

        Defendant.

### PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1.     **The Parties.**  The parties to this agreement are the United States Attorney's Office for the Western District of Missouri, represented by United States Attorney Timothy A. Garrison and Assistant United States Attorney Steven M. Mohlhenrich, and the Public Integrity Section of the U.S. Department of Justice, Criminal Division, represented by Acting Chief AnnaLou Tirol and Trial Attorney Marco A. Palmieri (otherwise referred to as "the Government" or "the United States"), and the defendant, Marilyn Luann Nolan ("the defendant"), represented by Mark A. Thornhill, Esq.  The defendant understands and agrees that this plea agreement does not bind any other federal, state or local prosecution authority or any other government agency, unless otherwise specified in this agreement or any addendum thereto.

2.     **Defendant's Guilty Plea**.  The defendant agrees to and hereby does plead guilty to the Information, charging her with a violation of **18 U.S.C. § 371**, that is, Conspiracy.  By entering into this plea agreement, the defendant admits that she knowingly committed this offense, and is, in fact, guilty of this offense.

3. **Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offenses to which the defendant is pleading guilty are as follows:

A. <u>Introduction and Background</u>

Preferred Family Healthcare, Inc. ("PFH") was a Missouri nonprofit corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Greene County, Missouri, within the Western District of Missouri. PFH and its subsidiaries provided a variety of services to individuals in Missouri, Arkansas, Kansas, Oklahoma and Illinois, including mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services. Originally, and for most of its existence, PFH was known as Alternative Opportunities, Inc. ("AO"), a Missouri nonprofit corporation formed on December 3, 1991, and headquartered at 1111 South Glenstone Avenue, in Springfield, Missouri. Effective May 1, 2015, AO merged with Preferred Family Healthcare, Inc., of Kirksville, Missouri, with the merged entity (the "Surviving Corporation") retaining the PFH name and corporate charter. (Hereinafter, "the Charity" shall refer to the entity known as Preferred Family Healthcare, Inc., after April 30, 2015, and Alternative Opportunities, Inc., prior to May 1, 2015.)

Most of PFH's funding was from appropriated federal funds—the largest portion of that being Medicaid reimbursement. For the fiscal years 2005 through 2017, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity received annually at least $10,000 in funds from the Federal government, more particularly, the Departments of Health and Human Services ("HHS"), Labor ("DOL"), Veterans Affairs ("VA"), Housing and Urban Development ("HUD"), Justice ("DOJ"), Agriculture ("USDA"), and Education ("DoED") under programs involving grants, contracts, loans, guarantees, insurance, and other forms of federal assistance.

The defendant MARILYN LUANN NOLAN ("NOLAN"), a resident of Springfield, Missouri, began working at the charity in 1992. NOLAN was the Charity's Chief Executive Officer ("CEO"), and oversaw the Charity's lobbying and governmental affairs activities. NOLAN had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity.

"Person #1," a resident of Springfield, Missouri, Boulder, Colorado, and Westminster, Colorado, was one of the original founders of the Charity. Person #1 was the Charity's Chief Financial Officer ("CFO"), and had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity.

Case 6:18-cr-03133-BCW   Document 10   Filed 11/09/18   Page 2 of 21

"Person #2," a resident of Springfield, Missouri, Boulder, Colorado, and Westminster, Colorado, began working for the charity in 1994. Person #2 was the Charity's Chief Operating Officer ("COO"), and served as the chief administrator over personnel in all programs and services. Person #2 had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity, and was commonly recognized as the "boss" of the Charity.

Keith Fraser Noble ("Noble"), charged elsewhere, was a Licensed Psychologist and Certified Substance Abuse Counselor. Noble was a consultant for the Charity before joining the Charity in 1994, and thereafter held the position of Director of Clinical Services until approximately 2014 or 2015 when his title was changed to Chief Clinical Officer ("CCO"). Noble was responsible for overseeing clinical operations and the provision of services, quality control matters, and assisting in drafting the Charity's grant proposals involving clinical and medical grants.

The term "Resource Team," often abbreviated "RT," was used within the Charity to refer to the Charity's highest level of executive leadership. The composition of the Resource Team changed slightly over time, but throughout the period relevant to this Information, the RT included Person #1, Person #2, NOLAN, and Noble.

Milton Russell Cranford, also known as "Rusty" Cranford ("Cranford"), charged elsewhere, was a resident of Rogers, Arkansas and lobbyist registered with the Arkansas Secretary of State. Beginning in 2007, upon the Charity's acquisition of Dayspring Behavioral Health Services, Cranford also was an employee of the Charity, serving as its executive overseeing company operations in the state of Arkansas. Also, Cranford operated three lobbying firms: The Cranford Coalition, The Capitol Hill Coalition, and Outcomes of Arkansas.

Eddie Wayne Cooper ("Cooper"), charged elsewhere, was an Arkansas State Representative from 2006 through January 2011, and a lobbyist registered with the Arkansas Secretary of State from January 20, 2011, onward. On April 20, 2009, the Charity hired Cooper as a full-time employee, with the job title of "Regional Director." Cooper's employment with the Charity ended on April 26, 2017. From October 2009 through April 2015, Cooper also was a member of AO's Board of Directors. Cooper also worked for The Cranford Coalition as a lobbyist, and received payments from The Cranford Coalition as a contract employee.

Donald Andrew Jones, also known as "D.A." Jones ("Jones"), charged elsewhere, was a resident of Willingboro, New Jersey, and a Philadelphia, Pennsylvania-based political operative. Jones owned and operated the firm, D.A. Jones & Associates, which purported to provide political and advocacy services, including consulting, analysis, and public relations.

3

"Entity A" was a Missouri limited liability company ("LLC") that was used as the management company for AO. Entity A was formed in 1995 by Person #1, Person #2, NOLAN, Noble, and three of their associates. In 2006, Entity A was sold to "Company A," a publicly-traded corporation, by its five remaining owners: Person #1, Person #2, NOLAN, Noble, and Person #15; however, Person #1 continued to exercise actual control over the bank accounts and activities of Entity A.

"Entity B" was a Missouri LLC formed in 2005, and owned by Person #1, Person #2, NOLAN, Noble, and one other person. Immediately prior to the 2006 sale of Entity A to Company A, Entity B acquired title to all real estate formerly held by Entity A.

"Entity C" was a Missouri LLC formed in 2007, and owned by Person #1, Person #2, NOLAN, Noble, and Entity B. Entity C held the title to the building located at 1111 Glenstone Avenue, in Springfield, Missouri, which was the corporation's headquarters, and duplex homes located on Olive Street, in Springfield, Missouri.

Jonathan Earl Woods ("Woods"), charged elsewhere, served as a Senator in the Arkansas Senate from 2013 to 2017. "Person #14" was an individual who was close to Woods.

"Arkansas Senator A" served as a Senator in the Arkansas Senate from 2011 to the present. Prior to his service in the Arkansas Senate, Arkansas Senator A previously served as a Representative in the Arkansas House of Representatives from 2000 until 2007. Arkansas Senator A was also an attorney during all times material to this Indictment doing business as Law Firm A.

Henry Wilkins IV ("Wilkins"), charged elsewhere, served as a Representative of House District 17 in the Arkansas House of Representatives from 1999 to 2001, and again from 2011 to 2015. Wilkins also served as a Senator representing District 5 in the Arkansas Senate from 2001 to 2011. Both House District 17 and Senate District 5 are located in the Eastern District of Arkansas. Wilkins also served as a pastor at St. James United Methodist Church ("SJUMC") located in Pine Bluff, Arkansas.

"Person #18" was a member of the Charity's Board of Directors, and also a lobbyist registered with the State of Oklahoma. From September 2008 to August 2017, the Charity paid Person #18 funds totaling approximately $413,575.

"Lobbying Firm D" was a Missouri LLC, located in Jefferson City, which provided various public affairs services to clients, including lobbying, consulting,

governmental relations, and public relations. Lobbying Firm D was operated by "Person #19" and "Person #20." From October 2008 until September 2017, the Charity paid Lobbying Firm D funds totaling approximately $914,400.

Section 501(c)(3) organizations were absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of, or in opposition to, any candidate for elective public office. Contributions to political campaign funds violated this prohibition, and could have resulted in denial or revocation of tax-exempt status and the imposition of certain excise taxes.

Further, organizations not considered "electing organizations" (those making an election under Section 501(h), which election the Charity did not make) were subject to the "No Substantial Part" rule, which provided that no substantial part of the organization's activities could constitute carrying on propaganda, or otherwise attempting to influence legislation. So the IRS and the public could monitor tax-exempt organizations' compliance with the "No Substantial Part" Rule, Section 501(c)(3) organizations not making an election under Section 501(h), including the Charity, were required to disclose any and all lobbying activity in Part IX (Statement of Functional Expenses) of their annually-filed IRS Forms 990.

For the fiscal years 2008 through 2016, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity filed IRS Forms 990 as set forth in the Information.

Recipients of Federal contracts, grants, loans, and cooperative agreements, were prohibited by law from expending appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

B.    Defendant's Plea to the Information

The defendant admits, acknowledges and agrees that at least as early as 2008, until on or about June 30, 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, Person #1, Person #2, NOLAN, and Cranford, conspired and agreed with each other, and with others known and unknown to the United States, to embezzle, steal, obtain by fraud, and without authority knowingly misapply and convert to their use, property worth at least $5,000 and under the care, custody, and control of the Charity, an organization receiving in each one-year period from July 1, 2008, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, that is, millions of dollars that were

5

misapplied for substantial, undisclosed payments to lobbying firms and political advocates, monetary and in-kind contributions to the campaigns of candidates for public office, and to bribe public officials; in violation of Title 18, United States Code, Section 666(a)(1)(A).

The conspirators caused the Charity to misapply funds for substantial, undisclosed lobbying and political advocacy, monetary and in-kind contributions to the campaigns of candidates for public office, and to bribe public officials—jeopardizing the Charity's tax-exempt status in order to increase revenue, and thereby enrich themselves.

*Lobbying and Political Advocacy*

The conspirators caused the Charity to misapply its funds to pay for lobbying that violated the "No Substantial Part" rule applicable to tax-exempt organizations (meaning, attempting to influence legislation), and which they concealed from the IRS and did not disclose on the Charity's Forms 990.

Moreover, the conspirators caused the Charity to misapply its funds for political advocacy, including lobbying in violation of the restrictions on organizations receiving public funds (meaning, expending appropriated funds to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement), and which they concealed from and did not disclose to the agencies awarding grants and contracts.

The conspirators caused the Charity to expend resources for lobbying and political advocacy, directly and through Entity A and Entity B, including: (a) substantial work performed by NOLAN, who in addition to holding the title of Chief Executive Officer supervised government relations for the Charity and directly lobbied legislators; (b) payments to Lobbying Firm D; (c) payments to the Cranford Coalition; (d) payments to Donald Andrew Jones; and (e) payments to Person #18.

*Political Campaign Contributions*

Person #1, Person #2, NOLAN, and Cranford caused the Charity to contribute financially to the campaigns of candidates for public office through "straw donors" including the Charity's lobbyists, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

6

Frequently, the conspirators caused the Charity to reimburse its lobbyists by way of invoices falsely describing the expenses as "training" and "consulting."

Additionally, the conspirators encouraged some Charity employees to contribute to candidates for public office and caused the Charity to reimburse them for those contributions by providing funds described as reimbursement for travel or other expenses the employees had not actually incurred.

The making of illegal campaign contributions was an integral part of the Charity's political operations, and regularly, Person #1 and Cranford discussed the Charity's "budget" for campaign contributions—which was not a budget category in the Charity's books and records.

*Organizing and Paying For Candidates' Fund-Raising Events*

The conspirators caused the Charity to provide in-kind contributions to the campaigns of candidates for public office, which were prohibited by law since the Charity was a tax-exempt organization.

In Arkansas, Cranford, Cooper and others organized fundraisers for many candidates running for seats in the Arkansas State Senate and Arkansas House of Representatives. At Cranford's direction, "Employee D" prepared and disseminated invitations for the events, which were often held at venues such as restaurants and hotels in Little Rock, Arkansas. Cranford, Cooper and others paid for expenses related to the fundraisers using their Charity-issued corporate credit cards.

In Missouri, at the direction of NOLAN and Person #1, "Employee H" organized fundraisers for several candidates running for seats in the Missouri State Senate, Missouri House of Representatives, and the Greene County Commission. At the direction of NOLAN, Employee H prepared and disseminated invitations to these fundraising events, using the Charity's resources. At the direction of NOLAN, Employee H arranged for catering, liquor, decorations, and other food. Employee H used his/her Charity-issued corporate credit card for the purchases, with NOLAN's knowledge.

*Bribes*

Some of the funds misapplied by the conspirators were used to bribe elected public officials. Person #1, Person #2, and Cranford offered and gave things of value to numerous public officials, in exchange for their official actions benefitting the Charity and themselves personally, including: travel and entertainment not reported on IRS Forms 990, premium tickets to sporting events, hotel

7

accommodations, and use of the Charity's luxury/recreational real estate; hiring public officials and family members of public officials as Charity employees; disguising bribes as contract payments for things such as consulting, training, and legal services; and cash.

In or about 2010-2017, Person #1, Person #2, Cranford, and others known and unknown to the United States, paid bribes in the form of money and other things of value to Woods, Wilkins, Arkansas Senator A, and others known and unknown to the United States, in exchange for them providing favorable legislative action for the Charity, and others known and unknown to the United States.

*Concealment and False Statements*

Concealment of the schemes was an integral and necessary part of the conspiracy. To provide a veneer of legitimacy for the unlawful payments to others and to disguise the nature and source of the payments, the conspirators caused the Charity's books and records to misrepresent, conceal, and cover up the nature of the services provided by elected public officials, lobbyists and advocates, and financial contributions to elected public officials and their political campaigns, by falsely describing such payments as being for training and consulting, and by causing the Charity to execute sham consulting agreements, training agreements, and agreements for other services.

*Overt Acts*

The defendant admits and acknowledges that she and her co-conspirators undertook numerous overt acts in furtherance of the conspiracy charged in the Information, including those set forth in the Information.

C.    Amounts Misapplied for Purpose of Guidelines Computation

The Government and the defendant agree that the loss amount, for United States Sentencing Guidelines computation purposes, will be the amounts misapplied pursuant to the conspiracy set forth above. The parties reserve the right to litigate the exact amount of that loss, for Guidelines computation purposes. The defendant understands that the Government believes the loss amount to be approximately six million dollars, and the Government understands the defendant maintains the loss amount should be calculated to be no more than $2.8 million dollars.

D.    Defendant's Gain and Agreed Restitution

The defendant acknowledges that from at least as early as 2005, and continuing through at least June 30, 2017, Person #1, Person #2, David Carl Hayes,

and others, embezzled, stole, obtained by fraud, and without authority knowingly misapplied and converted to their use millions of dollars in funds, from which embezzlement she profited. Because Person #1, Person #2, and Hayes did not include the defendant in much of the decision-making regarding the financial operations of the Charity, the defendant maintains—and the Government agrees— NOLAN did not know the full details of the many embezzlement and misapplication of funds schemes perpetrated by Person #1, Person #2, Hayes, and others. However, the defendant acknowledges she knew at the time that many of the schemes concocted by the conspirators, such as the sale of Entity A to Company A, were perpetrated for the primary purpose of enriching the Resource Team, including herself. Further, the defendant acknowledges she knew at the time that the Charity bore additional cost from many of those transactions, and willfully blinded herself regarding the details of the conspirators' schemes and artifices to defraud the Charity.

From 2005 through June 30, 2017, NOLAN received funds totaling **$4,131,111.36**, which were the proceeds of the embezzlement, theft, misapplication and unlawful conversion of Charity funds and property, as set forth below, which amount the defendant agrees to pay to the United States in restitution, as specified in Paragraph 6 of this plea agreement.

   i.   NOLAN's share of the proceeds from the sale of Entity A to Company A:

| Date | Description | Amount |
|---|---|---|
| 05/09/2007 | First earn-out from Company A | $ 1,546,008.00 |
| 04/08/2008 | Second earn-out from Company A (cash) | $ 1,667,646.56 |
|  | Second earn-out from Company A (stock) | $ 555,882.19 |
|  | **Total:** | **$ 3,769,536.75** |

   ii.   Checks to NOLAN from Entity C and Entity B:

| Check # | Written Date | Payor | Amount |
|---|---|---|---|
| 2386 | 10/15/2012 | Entity B | $ 10,000.00 |
| 2278 | 10/15/2012 | Entity C | $ 5,000.00 |
| 2454 | 1/1/2013 | Entity B | $ 50,000.00 |
| 4041 | 5/17/2013 | Entity C | $ 20,000.00 |
| 4184 | 12/16/2013 | Entity C | $ 15,000.00 |
| 2691 | 12/16/2013 | Entity B | $ 5,000.00 |
| 4411 | 12/31/2014 | Entity C | $ 15,000.00 |
| 2943 | 3/20/2015 | Entity B | $ 41,054.66 |
| 2956 | 4/16/2015 | Entity B | $ 50,000.00 |

9

| Check # | Written Date | Payor | Amount |
|---------|-------------|-------|--------|
| 4534 | 4/16/2015 | Entity C | $ 100,000.00 |
| 4454 | 12/31/2015 | Entity C | $ 38,019.95 |
| 2992 | 4/10/2017 | Entity B | $ 12,500.00 |
| | | **Total:** | **$ 361,574.61** |

      iii.    Subsequently, NOLAN and the other members of the RT each made a payment of $200,000 to Company A, to compensate Company A under the terms of a sham consulting agreement Person #1 and Hayes had caused the Charity to enter into with Company A. This amount is deducted from the defendant's total gain, for restitution purposes.

4.      **Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining her guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment, as well as all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which she is pleading guilty.

5.      **Statutory Penalties.** The defendant understands that, upon her plea of guilty to the single-count Information, charging her with violation of **18 U.S.C. § 371**, that is, **Conspiracy**, the maximum penalties the Court may impose are 5 years' imprisonment, 3 years of supervised release, a fine of $250,000 (or twice the amount of the gross gain or gross loss, whichever is greater), an order of restitution, and a $100 mandatory special assessment, which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class D felony.

10

6.      **Agreed Restitution.**  Pursuant to 18 U.S.C. § 3663(a)(3), the Government and the defendant stipulate and agree the defendant will pay restitution to the United States Treasury in the amount of **$4,131,111.36**, less credit for amounts the defendant paid to the Treasury in taxes on the proceeds of the criminal scheme, as calculated by the United States in its sole discretion.  The defendant agrees to furnish income tax returns and financial records to the United States within 10 days of the entry of this plea, to enable the United States to make this calculation, and understands and acknowledges that the United States' computation is not subject to appeal.

7.      **Sentencing Procedures.**  The defendant acknowledges, understands and agrees to the following:

a.      In determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable."

b.      The Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing.

c.      In addition to a sentence of imprisonment, the Court may impose a term of supervised release of **up to three years**; the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed.

d.      If the defendant violates a condition of her supervised release, the Court may revoke her supervised release and impose an additional period of imprisonment of **up to two years** without credit for time previously spent on supervised release.  In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed **three years**, less the term of imprisonment imposed upon revocation of the defendant's first supervised release.

e.      The Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range.

11

f.      Any sentence of imprisonment imposed by the Court will not allow for parole.

g.      The Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office.

h.      The defendant may not withdraw her guilty plea solely because of the nature or length of the sentence imposed by the Court.

8.      **<u>Government's Agreements.</u>**  Based upon evidence in its possession at this time, the United States, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to the crimes charged in the Information for which it has venue and which arose out of the defendant's conduct described above.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement.  If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence.  The defendant expressly waives her right to challenge the initiation of the dismissed or additional charges against her if she breaches this agreement.  The defendant expressly waives her right to assert a statute of limitations defense if the dismissed or additional charges are initiated against her following a breach of this agreement.  The defendant further

understands and agrees that, if the United States elects to file additional charges against her following her breach of this plea agreement, she will not be allowed to withdraw her guilty plea.

9. **Preparation of Presentence Report.**  The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct.  This may include information concerning the background, character and conduct of the defendant, including the entirety of her criminal activities.  The defendant understands these disclosures are not limited to the counts to which she has pleaded guilty.  The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies.  The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement.  The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

10. **Withdrawal of Plea.**  Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court.  In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible.  However, after the plea has been formally accepted by the Court, the defendant may withdraw her pleas of guilty only if the Court rejects the plea agreement, or if the defendant can show a fair and just reason for requesting the withdrawal.  The defendant understands that, if the Court accepts her pleas of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable

Case 6:18-cr-03133-BCW   Document 10   Filed 11/09/18   Page 13 of 21

Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, she will not be permitted to withdraw her pleas of guilty.

11. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable."

b. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2B1.1, which provides for a **base offense level of six**.

c. The defendant has admitted her guilt and clearly accepted responsibility for her actions, and has assisted authorities in the investigation or prosecution of her own misconduct by timely notifying authorities of her intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, she is entitled to a three-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines. The Government, at the time of sentencing, will file a written motion with the Court to that effect, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and her pretrial release; or (2) attempts to withdraw her guilty plea, violates the law, or otherwise engages in conduct inconsistent with her acceptance of responsibility

d. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

e. The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that she will make during her plea colloquy, will be used to calculate the defendant's Guidelines range.

Case 6:18-cr-03133-BCW   Document 10   Filed 11/09/18   Page 14 of 21

12. **Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in **paragraph 11** and its subsections. **As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.**

13. **Change in Guidelines Prior to Sentencing.** The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

14. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

      a.     oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

      b.     comment on the evidence supporting the charges in the information;

      c.     oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed, and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

      d.     oppose any post-conviction motions for reduction of sentence, or other relief.

Case 6:18-cr-03133-BCW   Document 10   Filed 11/09/18   Page 15 of 21

15. **Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that she has been advised of, understands, and knowingly and voluntarily waives the following rights:

      a.     the right to plead not guilty and to persist in a plea of not guilty;

      b.     the right to be presumed innocent until her guilt has been established beyond a reasonable doubt at trial;

      c.     the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

      d.     the right to confront and cross-examine the witnesses who testify against him;

      e.     the right to compel or subpoena witnesses to appear on her behalf; and

      f.     the right to remain silent at trial, in which case her silence may not be used against him.

The defendant understands that, by pleading guilty, she waives or gives up those rights and that there will be no trial. The defendant further understands that, if she pleads guilty, the Court may ask her questions about the offenses to which she pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, her answers may later be used against her in a prosecution for perjury or making a false statement. The defendant also understands that she has pleaded guilty to felony offenses and, as a result, will lose her right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

16

16. **Waiver of Appellate and Post-Conviction Rights.**

a.      The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, she waives her right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

b.      The defendant expressly waives her right to appeal her sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) a sentence imposed in excess of the statutory maximum.  However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal her sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

17.     **Discovery Waiver.**  The defendant waives the right to any further discovery or disclosures of information not already provided at the time of the entry of the guilty plea, other than information required to be disclosed under Federal Rule of Criminal Procedure 32(i)(2) and exculpatory or impeachment information casting doubt upon sentencing factors.

18.     **Financial Obligations.**  By entering into this plea agreement, the defendant represents that she understands and agrees to the following financial obligations:

a.      The Court must order restitution to the victims of the offense to which the defendant is pleading guilty.  The defendant agrees that the Court may order restitution in connection with all other uncharged, related criminal activity.

b.      The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

c.      The defendant will fully and truthfully disclose all assets and property in which she has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party.  The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

17

d.     Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit: (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

e.     At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of forfeitable assets and restitution.

f.     The defendant hereby authorizes the USAO to obtain a credit report pertaining to her to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

g.     The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of **$100** by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The defendant agrees to provide the Clerk's receipt as evidence of her fulfillment of this obligation at the time of sentencing.

h.     The defendant certifies that she has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that she will make no such transfers in the future.

i.     In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

18

19.     **Waiver of FOIA Request.**  The defendant waives all of her rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

20.     **Waiver of Claim for Attorney's Fees.**  The defendant waives all of her claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

21.     **Defendant's Breach of Plea Agreement.**  If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement.  The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw her pleas of guilty.

The defendant also understands and agrees that, in the event she violates this plea agreement, all statements made by her to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by her before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against her in any and all criminal proceedings.  The defendant waives any rights that she might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the

Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by her subsequent to this plea agreement.

22. **Defendant's Representations.**  The defendant acknowledges that she has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel.  The defendant acknowledges that she is satisfied with the assistance of counsel, and that counsel has fully advised her of her rights and obligations in connection with this plea agreement.  The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, her attorneys, or any other party to induce her to enter her pleas of guilty.

23. **No Undisclosed Terms.**  The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

24. **Standard of Interpretation.**  The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.  The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

TIMOTHY A. GARRISON
United States Attorney, Western District of Missouri

Dated: _11/8/2018_       By: _/s/ Steven M. Mohlhenrich_
STEVEN M. MOHLHENRICH
Assistant United States Attorney

ANNALOU TIROL
Acting Chief, Public Integrity Section

Dated: _11/8/2018_       By: _/s/ Marco A. Palmieri_
MARCO A. PALMIERI
Trial Attorney

I have consulted with my attorney and fully understand all of my rights with respect to the offense charged in the information. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: _11/8/2018_       _/s/ Marilyn Luann Nolan_
MARILYN LUANN NOLAN
Defendant

I am defendant Marilyn Nolan's attorney. I have fully explained to her her rights with respect to the offense charged in the information. Further, I have reviewed with her the provisions of the Sentencing Guidelines that might apply in this case. I have carefully reviewed every part of this plea agreement with her. To my knowledge, Marilyn Nolan's decision to enter into this plea agreement is an informed and voluntary one.

Dated: _11/8/2018_       _/s/ Mark A. Thornhill_
MARK A. THORNHILL
Attorney for Defendant

21